**IN THE COURT OF APPEALS OF IOWA**

No. 14-1048
Filed October 1, 2014

**IN THE INTEREST OF T.C.,**
     **Minor Child,**

**C.C., Mother,**
     Appellant.
_____

Appeal from the Iowa District Court for Linn County, Susan Flaherty, Associate Juvenile Judge.


A mother appeals from the denial of a joint request to modify the permanency goal for her son from another planned permanent living arrangement to reunification with the parents. **AFFIRMED.**


Deborah M. Skelton, Walford, for appellant.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Jerry Vander Sanden, County Attorney, and Rebecca Belcher, Assistant County Attorney, for appellee.

Jessica Wiebrand, Cedar Rapids, for father.

Cynthia Finley, Cedar Rapids, for minor child.

Robert W. Davison, guardian ad litem for minor child.


Considered by Vaitheswaran, P.J., and Doyle and McDonald, JJ.

**MCDONALD, J.**

The mother, Carrie, appeals from the denial of a joint request to modify the permanency goal for her son, T.C., from another planned permanent living arrangement (hereinafter "APPLA") to reunification with the parents. She contends the court erred in disregarding the opinions of the department of human services and the guardian ad litem, incorrectly based its decision on a perceived lack of parental change instead of focusing on changes the child has made and the child's needs, and erred in concluding the child's current foster care placement is secure.

I.

We review a juvenile court's permanency order de novo. *See In re N.M.*, 528 N.W.2d 94, 96 (Iowa 1995). We examine the entire record and adjudicate rights anew on the issues properly preserved and presented. *See In re A.S.T.*, 508 N.W.2d 735, 737 (Iowa Ct. App. 1993). We give weight to the findings of the juvenile court, especially when considering the credibility of witnesses, but are not bound by them. *Id.* The party seeking modification of a permanency order must show a substantial and material change in circumstances such that modification is in the best interest of the child. *In re D.S.*, 563 N.W.2d 12, 15 (Iowa Ct. App. 1997); *see also In re C.D.*, 509 N.W.2d 509, 511 (Iowa Ct. App. 1993).

II.

This appeal involves T.C., the youngest of four children born to the parents. Carrie, T.C.'s mother, has a daughter born in 1990. Mark, T.C.'s father,

has a daughter born in 1994. Carrie and Mark married in 1994 and divorced in 2006. They had two sons together: one born in 1996; and T.C., born in 1998.

This family came to the attention of the department of human services some time ago and has extensive history with the department and with the juvenile court. T.C. and his paternal half-sister came to the attention of the department of human services in March 2007 because of a confirmed child abuse assessment arising out of Carrie's physical abuse of the half-sister. T.C. and his paternal half-sister were adjudicated as children in need of assistance in May 2007. Prior to this assessment, the family had sought the assistance of the department in managing the out-of-control behaviors of T.C.'s older brother.

In March 2008, T.C. was placed with Mark. In August 2008, T.C. was removed from Mark and placed in family foster care. In March 2010, following an unsuccessful trial placement with Mark again, T.C. was placed in residential treatment because of his behavioral issues. T.C. was diagnosed with ADHD and oppositional defiant disorder. In September 2010, the court changed the permanency goal for this child from reunification with the parents to APPLA with a goal of placement in family foster care after completion of residential treatment. In August 2011, the court ordered family foster care as a less-restrictive placement because T.C. had reached maximum benefits in residential treatment. By December 2011, T.C. had failed in two foster family placements and was placed in shelter care. In January 2012, T.C. was returned to residential treatment because of his behaviors. In February 2013, the court again ordered a

less-restrictive placement upon the request of the residential treatment facility. The child has remained with the same foster family since that time.

At some point after Mark and Carrie's divorce, the father remarried. Mark later divorced that wife and reconciled with Carrie. At the time of the modification hearing, Mark and Carrie were cohabiting. After T.C.'s release from the second residential treatment in February 2013, Carrie and Mark began visitation with T.C. In April 2014, the parents and child filed a joint application to modify the objective of the case permanency plan from APPLA to reunification with the parents. By that time, T.C. was spending every weekend with his parents.

The court denied the joint application and directed the department to review and update the case plan. The court noted the department supervisor testified the department had no objection to the requested change. However, the court found the parents presented no evidence to support the idea the child could be successful in parental care and no information regarding parental change. Although recognizing the child's desire to return home, the court found the evidence "insufficient to support a finding that such a move at this time has a reasonable chance of success, promotes the child's permanency, or is in his best interest."

III.

A.

Carrie contends the court erred in disregarding the recommendations of the department and guardian ad litem. We disagree.

At the modification hearing, the department supervisor testified the department had no objection to the requested change, "though we did talk about the concerns and needs for ongoing service and the need for ongoing service and transition." The supervisor added that the department considered the child's age, his ongoing regular contact with his family, and its belief "we may not be able to maintain the child's current placement, and if so, placement for him would be hard to find, especially close to his family." The department also anticipated that if T.C. did not return home at this time, "the likelihood of him returning home when he turns eighteen would be high, so it would be ideal to provide services so he could transition successfully as an adult." The supervisor agreed that if the permanency goal were changed, the department would recommend a transition back to the parental home with services such as family safety, risk, and permanency (FSRP); emergency services; and daily check-ins "to make sure he's doing well in the home and doing well with the parents."

The case plan received as part of the mother's exhibit A contains a February 2014 report from DHS. The report noted the department does not resist the parents' request for a change in the permanency goal, but also noted the department would implement FSRP services again and would expect the parents to continue with therapy, and medication management. The report continued:

> That is not to say that the Department does not have concerns but believes that if the parents put in the effort and are honest and work with providers and SWCM that placement has the potential to be successful. [The brothers] also need for their parents to have realistic expectations for them, based on their mental health, behaviors, and abilities.

The guardian ad litem filed a report to the court. He opined:

> While I have significant doubts that returning home will work, I am not opposed to increasing [the child's] time with his parents over the summer to explore the possibility. One of my biggest concerns is [the child's] relationship with his brother and, if [the older brother] does indeed return home following discharge from [residential treatment], changes will need to occur between them for the placement to work. I recommend that prior orders continue regarding both children but do not object to changing the permanency goal in [this child's] case.

Near the close of the modification hearing, the guardian ad litem "expanded" on his recommendation. He stated he thought it was inevitable T.C. would live with his parents some day. He thus thought a transition with services was "worth trying." He continued, "The family has wanted to do this for some time. I don't think there have been any major issues that would raise any safety concerns, and at this point my recommendation would be in support of changing the goal."

While Carrie interprets this evidence as unambiguously in support of a change in the permanency plan, it is not so clear. The evidence from the department is only that it "does not object" to the requested change. The department did not necessarily recommend the change. The guardian ad litem initially recommended maintenance of the status quo. At the modification hearing, he changed his recommendation, but presented no evidence in support of that change. We conclude the district court gave proper consideration to the recommendations and concerns of the department and the guardian ad litem.

B.

Carrie also contends the court incorrectly based its decision on a perceived lack of parental change instead of focusing on changes the child has made and the child's needs. We disagree it was improper to consider the

parents' circumstances. The "primary concern" in this context is the child's best interests. *See D.S.*, 563 N.W.2d at 14. In the case before us, the mother and child (as joint applicants) have the burden to show "the circumstances have so materially and substantially changed that a modification is in the best interests of the child." *See id.* at 15. Proof of a change in circumstances necessarily involves examining the parents' ability to parent and the child's needs. *See id.* (stating that when considering whether to modify a permanency order, "[p]art of our focus may be on parental change, but the overwhelming bulk of the focus is on the child[ ] and [his] needs").

When T.C. was removed in 2007, Mark and Carrie were divorced and had shared physical care. The parents have since reconciled and cohabit. While it appears neither Carrie nor Mark could independently address and manage T.C.'s behaviors in 2007, they claim to be able to jointly address and manage visitations with T.C. The child has improved in his ability to control his impulsive and improper behavior, but he still exhibits negative behaviors. For example, T.C. started reacting negatively to going from visitation, where he had fewer rules and restrictions, back to the foster family, where he had more rules and restrictions. In addition, as of February 2014, T.C. still needed BHIS services, counseling services, and medication management. He needs routine, expectations, and structure.

The juvenile court has been involved with this family for at least seven years and is well aware of the past issues with the parents and at least three of the four children. The court has conducted review hearings several times a year

for several years and is aware of the progress the child has made and what still needs to be done. The court expressly stated a willingness to consider the requested change and have a trial period placement with the family, but required evidence the change was in the child's best interests. The court noted the application contained an assertion the parents had made great progress in fulfilling the goals of the case permanency plan, but in looking through the evidence "there is no reference to what the parents are doing in terms of the permanency goal. I don't have any reports from any service provider and I don't have the documentation, and I haven't heard any evidence on what the parents have been doing under the case plan." We conclude the court properly focused on both the parents' abilities to meet the child's needs and the child's best interests in ruling on the petition to modify.

## C.

Carrie also contends the court erred in concluding the child's current foster care placement is secure. The department supervisor voiced some concern about the ability to place the child in another foster home near the parents if this placement failed. The evidence from the months preceding the hearing reveals the child had reacted negatively from the differences in structure between the foster home and his parents' home. There was a concerning incident involving acts of the child and another foster child in the foster family home just a few months before the hearing. The court inquired directly of the foster parents at the hearing, and the foster mother stated "we are willing to work with him." When asked about the department's concern the foster parents were on the brink of

giving notice, the foster father said "no, he has changed a lot in the last couple of weeks." We conclude the court did not act improperly in taking the word of the foster parents that the child's placement with them was not in jeopardy.

IV.

On our de novo review, we agree with the findings and conclusions of the juvenile court and adopt them as our own. We affirm the order denying the joint application to modify the permanency goal for this child from APPLA to reunification with the parents.

**AFFIRMED.**